Filed 12/16/14

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| MARINA PACIFICA HOMEOWNERS ASSOCIATION,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SOUTHERN CALIFORNIA FINANCIAL CORPORATION,<br><br>    Defendant and Appellant,<br><br>MARIANTHI LANSDALE et al.,<br><br>    Defendants and Respondents. | B251379<br><br>(Los Angeles County<br>Super. Ct. No. NC052700) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Patrick T. Madden, Judge.  Affirmed in part; reversed in part.

Locke Lord, Christopher J. Bakes and Daniel A. Solitro for Plaintiff and Appellant.

June Babiracki Barlow and Neil Kalin for California Association of Realtors as Amicus Curiae on behalf of Plaintiff and Appellant.

Greenberg Traurig, Scott D. Bertzyk, Adam Siegler and Matthew R. Gershman for Defendant and Appellant and Defendants and Respondents.

---

[*]    Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts 1.b. and 2 of the Discussion.

This litigation between plaintiff Marina Pacifica Homeowners Association (the HOA) and defendants William Lansdale[1] and Southern California Financial Corporation (SCFC) concerns the Marina Pacifica Condominium Project (Marina Pacifica) in Long Beach, California. SCFC appeals, and the HOA cross-appeals, from the judgment after a bench trial. The parties' dispute centers around a monthly fee the residents of Marina Pacifica pay to the developers of the condominiums, or the developers' successor in interest, called the "assignment fee." We affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Marina Pacifica's Development and Pertinent Transactions

Marina Pacifica is a 570-unit complex on the Long Beach waterfront. At the time of Marina Pacifica's construction in the early 1970's, the McGrath Trust owned the land on which the complex was built. Lansdale obtained an option on a ground lease from the McGrath Trust. He contributed the ground lease option to Marina Pacifica Limited Partnership (the limited partnership). The limited partners in this entity were Lansdale, Abe Reider, and William Dawson. The limited partnership exercised the ground lease option to develop and construct the Marina Pacifica complex.

The ground lease was subdivided into 570 identical leases, one for each condominium unit, entitled "Condominium Common Area and Unit Space Lease" (the unit lease). The McGrath Trust was the lessor and the limited partnership was the lessee under each unit lease. The unit leases were for a term of 68 years and would expire on September 30, 2041. When the limited partnership sold a condominium unit, it and the purchaser executed a standard document assigning the unit lease to the purchaser (the lease assignment). If unit owners sold their units, the seller and the subsequent purchaser

---

[1] We were advised during the pendency of this appeal that Lansdale had passed away. Accordingly, we entered an order on July 30, 2014, substituting in place of Lansdale the cospecial administrators of his estate, William Kozaites and Marianthi Lansdale. This substitution of parties notwithstanding, for convenience, we will continue to refer to "Lansdale" throughout this opinion. Occasionally, we will use "defendants" to refer to Lansdale and SCFC collectively.

executed a standard document assigning the seller's rights, interests, and obligations under the unit lease to the subsequent purchaser (resale assignment).

Thus, unit owners purchased an ownership interest in their condominium units plus an undivided leasehold interest in the land underlying the complex. The unit leases required owners to make two monthly payments: rent payable to the landowner (the McGrath Trust), and an "assignment fee" payable to the developer (the limited partnership). As we explain below, both of these payments were to be nominal from the early 1970's to 2006. In 2006, however, the rent and assignment fee would be recalculated so that together, they would equal 10 percent of the value of the land underlying the units.

**Rent:** Monthly rent was $15 from June 1973 to September 2006. Under paragraph 3.(b) of the unit lease, from October 2006 to September 2021, monthly rent would become the greater of (1) $25 or (2) 1/12th of 6 percent of the fair market value of the leasehold premises, as of October 1, 2006.

**Assignment Fee:** "[F]or and in consideration of" the limited partnership's assignment of its interest in the leasehold estate to unit owners, the unit owners and each of their successors and assigns would pay to the limited partnership "a continuing assignment fee" under paragraph 4 of the unit lease. Until September 2006, the assignment fee was $13 to $35 depending on the unit and was subject to cost of living increases every five years. From October 2006 to September 2021, the monthly assignment fee would "be equal to the amount, if any, by which one-twelfth (1/12) of ten percent (10%) of the fair market value of the leasehold premises on October 1, 2006 exceed[ed] the monthly rent payable under part (b) of Paragraph 3" of the unit lease.[2]

The unit lease stated the provisions of the assignment fee paragraph were "intended by the parties hereto to be separate and independent from all remaining provisions" of the unit lease, and would "constitute, and be construed as creating, a separate contractual

---

[2]     Both the rent and assignment fee were to be recalculated again for the period October 2021 to September 2041 using the same formulas described above, except that the fair market value of the leasehold premises was to be determined as of October 1, 2021.

obligation of the Assignee of [the limited partnership] and all of the successors and assigns of said assignee . . . ."

A copy of the unit lease itself was not recorded. But in May 1973, the limited partnership caused a "Memorandum of Condominium Common Area and Unit Space Leases" to be recorded with the Los Angeles County Recorder's Office. This memorandum was recorded against the entire Marina Pacifica property and incorporated the unit leases by reference. Additionally, each lease assignment or resale assignment was recorded against its respective condominium unit. The lease assignments and resale assignments also incorporated the unit leases by reference.

In connection with the purchase of any unit, the HOA gave each purchaser a packet of documents. Among other things, the packet contained sample copies of the unit lease and the lease assignment and an "information sheet" stating the purchaser's monthly rent and assignment fee would be readjusted on October 1, 2006, and October 1, 2021, in accordance with the fair market value of the leasehold premises on those dates. The information sheet also directed purchasers to the relevant paragraphs and page numbers of the unit lease for the rent and assignment fee. The parties to this lawsuit stipulated that each purchaser of a Marina Pacifica unit had notice of the unit lease and its contents, including the specific paragraph setting forth the assignment fee.

Unit owners originally paid the assignment fee to the limited partnership. When the limited partnership completed developing and selling all the units, the partners dissolved the entity. Upon dissolution, the limited partners each received a share of the assignment fee—Lansdale received 43.75 percent, Dawson received 37.75 percent, and Reider received 18.5 percent.

In December 1999, the HOA purchased the land underlying Marina Pacifica from the McGrath Trust for $17 million. Each unit owner then paid the HOA for the owner's pro rata share of the land. As a result of this purchase, the unit owners no longer pay any rent under the unit lease.

From 1995 to 2005, the HOA attempted to negotiate with Lansdale, Dawson, and Reider to buy their interests in the assignment fee. The HOA wanted to eliminate the

4

obligation to pay the assignment fee before the October 2006 adjustment. The HOA successfully negotiated with Dawson and Reider. In 2000, it purchased their interests (collectively, 56.25 percent) for $5 million. It was unable to reach an agreement with Lansdale to buy his 43.75 percent interest in the assignment fee.

## 2. *Appraisal Litigation*

As discussed, the adjustments of the rent and assignment fee required the parties to determine the fair market value of the leasehold premises. The unit lease provided that the lessor—originally, the McGrath Trust—and the HOA would each select an appraiser, and their two appraisers would agree on a third appraiser to render an appraisal of the fair market value. After the HOA purchased the land from the McGrath Trust, it took the position that the interests of the lessor and lessee under the unit lease had merged, and it thus had the right to select an appraiser unilaterally for purposes of calculating the assignment fee. Lansdale disagreed and asserted he had a right to participate in the appraisal process by selecting one of the two initial appraisers. In 2005, Lansdale and the HOA filed dueling pleadings seeking declaratory relief to resolve this dispute (appraisal litigation).

The appraisal litigation went to trial. The HOA stipulated for purposes of the trial that Lansdale was the sole remaining assignee of the limited partnership and had "the sole right to collect his portion of the monthly Assignment Fees." Moreover, it stipulated "[t]he Assignment fee owned by Lansdale remains payable and Lansdale is the owner of 43.75% of the Assignment fee" (capitalization omitted).

In the court's statement of decision in the appraisal litigation, the court noted: "The monthly 'Assignment Fee' is a separate contractual obligation owed to [Lansdale] over the term of the Lease. The Assignment Fee is binding on the original purchasers and any subsequent purchasers in the Marina Pacifica condominium project."

The court found the interests of the lessor and lessee under the unit lease had merged and "the leasehold interest ha[d] been annihilated and no longer exist[ed]." There was no longer any lessor to appoint an appraiser, and therefore the appraiser-appointment method described in the unit lease could not be followed. The court held it would be inequitable and

5

unconscionable to permit only one party to appoint the appraiser, insofar as the original parties to the unit lease agreed the fair market value of the leasehold premises would be determined by an independent appraiser. The court determined it should appoint an independent appraiser pursuant to Code of Civil Procedure Section 1281.6 (providing a method for appointing an arbitrator, if the agreed method fails or for any reason cannot be followed).

On appeal, Division Two of this court affirmed the judgment in the appraisal litigation. (*Lansdale v. Marina Pacifica Homeowners Association* (Aug. 14, 2007, B192520) [nonpub. opn].)

Lansdale and the HOA participated in arbitration to implement the terms of the court's judgment. The court entered an order confirming the arbitrator's award, holding that, "[a]s of October 1, 2006, the fair market value of the property used for purpose of calculating the Assignment Fee due under the Lease . . . is the sum of $60,615,500."[3]

### 3. *2008 Assignment Fee Billing and Commencement of the Instant Action*

Lansdale assigned his 43.75 percent interest in the assignment fee to codefendant SCFC in January 2008. After the court affirmed the arbitrator's award in the appraisal litigation, SCFC began billing the unit owners for its share of the assignment fee in December 2008.

To review, the unit lease stated the monthly assignment fee was the difference between 1/12th of 10 percent of the land's fair market value and the monthly rent payable under the unit lease. SCFC's accountants adjusted the assignment fee for the newly appraised fair market value of the land and also to reflect that unit owners no longer paid rent since they had purchased the land. The accountants therefore calculated the total monthly assignment fee owing to SCFC as 43.75 percent of:

---

[3]    This dollar figure was the fair market value of the entire tract of land underlying Marina Pacifica. To determine the fair market value of the "leasehold premises" for just one unit owner, the dollar figure could be multiplied by the unit owner's pro rata share of the common area.

6

$$\frac{10\% \text{ x } \$60,615,500 \text{ [fair market value]} - \$0 \text{ [monthly rent unit owners actually paid]}}{12}$$

We will refer to this method of calculating the assignment fee as the "10 percent formulation."

The HOA sent unit owners a notice instructing them not to pay SCFC's bill and commenced this action three months later. The HOA's first amended complaint (FAC) alleges numerous causes of action for declaratory relief, breach of contract, breach of the covenant of good faith and fair dealing, reformation, and restitution. The gravamen of the FAC is that the assignment fee is invalid or unenforceable for several reasons, or assuming it is valid and enforceable, SCFC's billing vastly overstated the amount owing.

The HOA alleges the unit owners' purchase of the underlying land extinguished the unit lease—that is, the purchase caused a merger of the landlord's and tenants' estates. And, insofar as the unit lease stated that the assignment fee provision was a "separate contractual obligation," the HOA alleges the pertinent provision did not contain any other contractual language and did not recite any consideration flowing to the unit owners for payment of the assignment fee. As such, the assignment fee provision fails as a contract and is not an enforceable obligation.

The HOA also alleges the assignment fee is a "transfer fee" as defined by Civil Code section 1098,[4] and because defendants did not comply with the requirements of sections 1098 and 1098.5, SCFC could no longer collect the assignment fee after December 31, 2008. Thus, some of the causes of action for declaratory relief seek a declaration that the assignment fee is invalid after December 31, 2008, as a transfer fee under sections 1098 and 1098.5. Others seek a declaration that the assignment fee is invalid from an earlier date due to the merger of estates and extinguishment of the unit lease, the failure of consideration, or unconscionability. Still other causes of actions seek a declaration as to the proper calculation of the assignment fee, assuming it is valid for some period. The HOA alleges

---

[4] Further undesignated statutory references are to the Civil Code.

7

SCFC is not entitled to an amount based on 10 percent of the underlying land's value because it must deduct the rent the unit owners would have paid under the lease, had they not bought out the landowner. Because the monthly rent payable was 1/12th of 6 percent of the land's value, the HOA alleges SCFC is entitled, at most, to 1/12th of 4 percent of the land's value. In other words, the total monthly assignment fee owing to SCFC was 43.75 percent of:

$$\frac{10\% \times \$60,615,500}{12} - \frac{6\% \times \$60,615,500}{12} \text{ [monthly rent unit owners } \textit{would have} \text{ paid]} = \frac{4\% \times \$60,615,500}{12}$$

We will refer to this method of calculating the assignment fee as the "4 percent formulation." The HOA alleges the 4 percent formulation is the correct interpretation of the assignment fee provision.

The HOA's causes of action for breach of contract and breach of the covenant of good faith and fair dealing allege defendants breached the unit lease and the covenant by billing unit owners under the 10 percent formulation, rather than under the "agreed upon" 4 percent formulation.

### 4. *Motions for Summary Adjudication*

Defendants filed three motions for summary adjudication. The court denied two and granted one in part based on the statute of limitations. The court granted summary adjudication as to any claims, on any ground, that the assignment fee was void from its inception and that restitution may be had based on these claims. The court also granted the motion as to any claims running from the merger of estates in 1999. Specifically, the court granted summary adjudication as to the ninth, 10th, 11th, 12th, and 14th causes of action, except to the extent the ninth cause of action related to SCFC's calculation of the assignment fee in 2008. The HOA's cross-appeal relates to the court's summary adjudication ruling.

8

## 5. *Phases One and Two of Trial and Statement of Decision*

The court bifurcated the trial into several phases and tried phases one and two first. These phases dealt with (1) the remaining arguments that the assignment fee was invalid, and (2) the proper calculation of the assignment fee, if it was valid. The trial court issued a statement of decision on phases one and two setting forth mixed results for the parties. We summarize the pertinent portions of the statement of decision.

### a. Application of the Transfer Fee Statutes (Sections 1098, 1098.5)

The court held the assignment fee was a transfer fee within the meaning of section 1098, and none of the statutory exceptions set forth in section 1098 applied. Section 1098.5 states recording requirements the receiver of a transfer fee must meet to collect a fee imposed prior to January 1, 2008. The court held defendants failed to meet these requirements, and consequently, the assignment fee was not collectible at all after December 31, 2008, under the terms of the statute. The court noted the application of the transfer fee statutes to the assignment fee was a "pure question of law," and it therefore was not relying on any of the evidence presented at trial to resolve the issue.

### b. Proper Calculation of the Assignment Fee for the Period of Its Validity

Because the assignment fee was collectible through December 31, 2008, the court determined the proper calculation for the fee for the 2006 escalation. The court held the 4 percent formulation urged by the HOA was correct, not the 10 percent formulation as urged by defendants. It found:

"The parties never contemplated elimination of rent at the inception of the agreement. Defendants['] literal application of the formula results in a windfall. It would be entirely anomalous that by purchasing the property and eliminating the lease, the unit owners would be required to pay even more for an assignment of an interest no longer in existence. The law abhors absurd results. [¶] . . . [¶]

"It would be absurd for a party to pay an increased amount after the lease was extinguished. There is nothing in the voluminous record which would suggest such was the mutual intent of the parties. [T]he purchase of the land by the unit owners was never contemplated at the time the documents were drafted. The clear intent of the parties was to

9

adjust the amount of the assignment fee as the value of the leasehold increased or decreased over time."

The court held the "only reasonable and fair result" was to enforce the assignment fee provision as if the monthly rent were still due because "[t]hat was the mutual understanding of the parties when the contract was made - that some monthly rent payable would be due until the year 2041." Thus, the 4 percent formulation, which accounted for a monthly rent payment, was the correct formulation.

### c. Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing

The court found there was evidence Lansdale had represented during the appraisal litigation that he used the 4 percent formulation to calculate the assignment fee. Yet, when SCFC began billing the unit owners in 2008, it used the 10 percent formulation, and defendants contended in this case that the 10 percent formulation was correct. The court held that although it determined the 4 percent formulation was correct as opposed to the 10 percent formulation, defendants' conduct did not constitute breach of contract or breach of the implied covenant. Further, the instant litigation was part of a continuum of negotiations and actions concerning the assignment fee that went back to the appraisal litigation and earlier. The court held defendants' representations in both the appraisal litigation and the instant litigation were absolutely privileged under section 47, subdivision (b) (the litigation privilege).

### d. Lack of Consideration

The court held the escalation provision for the assignment fee (i.e., the fee increase in 2006 and 2021) did not fail for lack of consideration. The original unit owners and their successors "received consideration in the form of a unit within the development. They made that purchase subject not only to a purchase price, but to other conditions and covenants, including the assignment fee." The court further held the covenant to pay the assignment fee was separate from the unit lease itself. Therefore, the extinguishment of the lease through the merger of estates did not create a failure of consideration.

10

## 6. *Judgment*

When the trial court issued its tentative statement of decision, it ordered the parties to meet and confer as to the amount owed to defendants based on the court's findings. The parties did so and submitted competing proposed judgments to the court. The court reviewed the proposed judgments and objections to the proposed judgments and found some payment issues on which the parties disagreed. It appointed a referee, the Honorable Carl J. West (ret.), to resolve the disagreements.

After receiving the report and recommendation of the referee, the court entered judgment on July 23, 2013. The judgment set forth the amount owing under the 4 percent formulation for each unit owner and stated the unit owners collectively owed $2,436,818.03, payable to SCFC, which included prejudgment interest at the rate of 7 percent per annum. SCFC filed a timely notice of appeal. (Lansdale was not a party to this notice.) The HOA filed a timely notice of cross-appeal.

## DISCUSSION

## 1. *SCFC's Appeal*

SCFC raises two main issues on appeal. First, it contends the court's transfer fee rulings were in error. SCFC argues the assignment fee is not a transfer fee under section 1098, and even if it were, several statutory exceptions apply such that it could collect the fee after December 31, 2008. Second, it contends the 10 percent formulation, not the 4 percent formulation, represents the correct method for calculating the assignment fee under the unit lease.

## a. The Assignment Fee Is a Transfer Fee, But a Statutory Exception Urged by SCFC Applies

Before turning to the transfer fee statutes, we set forth some principles that guide our interpretation of them. The relevant facts here are undisputed. When this is the case, the construction of a statute and its applicability to the undisputed facts are questions of law we review de novo. (*County of San Bernardino v. Calderon* (2007) 148 Cal.App.4th 1103, 1106.) When we interpret a statute, our goal is to ascertain the Legislature's intent in enacting the statute and effectuate the purpose of the statute. (*Id.* at p. 1108.) We always

11

begin with the statutory language. (*Ibid.*) We construe the words in context and give them their usual and ordinary meaning. (*Ibid.*) When the language is unambiguous, "'we presume the Legislature meant what it said,'" and the plain meaning of the statute governs. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 29.) If the statutory language is ambiguous—that is, it permits more than one reasonable interpretation—we may consider extrinsic aids to interpretation. (*Ibid.*) Thus, it is appropriate to resort to legislative history, an extrinsic aid, only when the statutory language is ambiguous. (*Ibid.*) Ultimately, we "'must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute . . . .'" (*Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977-978.)

Applying these principles, we conclude the assignment fee falls within the general definition of a transfer fee, but a statutory exception applies to exclude the fee from the definition. As a consequence, the transfer fee statutes do not bar SCFC from collecting the assignment fee.

*i. Definition of Transfer Fee*

The first sentence of section 1098 defines a "'transfer fee'" as "any fee payment requirement imposed within a covenant, restriction, or condition contained in any deed, contract, security instrument, or other document affecting the transfer or sale of, or any interest in, real property that requires a fee be paid upon transfer of the real property."

The parties do not dispute the assignment fee is a "fee payment requirement." Further, it is "imposed within a covenant, restriction, or condition contained in any deed, contract, security instrument, or other document . . . ." (§ 1098.) A covenant is merely a promise to render some performance. (*Dillingham-Ray Wilson v. City of Los Angeles* (2010) 182 Cal.App.4th 1396, 1406, fn. 9.) The assignment fee is imposed within paragraph 4 of the unit lease, which contains a promise to pay the limited partnership an assignment fee. ("[T]he assignee, and each successor and assign of such assignee, hereby promises and agrees to pay to Marina Pacifica, a California limited partnership, or its order, a continuing

assignment fee . . . .") Accordingly, the assignment fee is imposed within a covenant contained in a "contract . . . or other document." (§ 1098.)

Focusing on the language that a transfer fee must be "imposed within a covenant, restriction, or condition," SCFC insists this language refers to what is "more commonly known in the real-estate industry as CC&Rs." SCFC asserts that because the assignment fee is not imposed in the Marina Pacifica CC&R's, the fee does not fall within the statutory definition. We are not persuaded by this argument.

"CC&R's" is a term of art referring to a specific type of document. "The 'declaration' or 'declaration of covenants and restrictions' is the term used to refer to the recorded legal document that serves as the principal document in the creation of a common interest development, such as a planned development or a condominium. . . . The declaration is commonly referred to as the 'declaration of covenants and restrictions,' or the abbreviated 'CC&Rs.'" (Hanna & Van Atta, Cal. Common Interest Developments: Law & Practice (Thomson Reuters 2014) § 2:16, citations omitted; see Smith-Chavez et al., Cal. Civil Practice: Real Property Litigation (Thomson Reuters 2014) § 8:2 ["A condominium project is governed by, among other documents, a Declaration of Covenants, Conditions, and Restrictions ('declaration' or 'CC & R')."].) While the shorthand term "CC&R's" is used often in practice, the statutes creating the CC&R's requirement for common interest developments (such as condominium projects) do not use this shorthand term. These statutes instead refer simply to the "declaration." (§§ 4135, 4200, 4250, 4255.) SCFC wants us to equate the phrase "a covenant, restriction, or condition" in section 1098 with the required "declaration" described in other sections of the Civil Code relating to common interest developments.

Assuming for the sake of argument that we were to follow SCFC's reasoning, and limit the language's meaning to CC&R's, the assignment fee nevertheless can be said to be "imposed within" Marina Pacifica's CC&R's. Marina Pacifica recorded a "Declaration of Restrictions" that it referred to as its "CC&R's." Among the obligations of unit owners set forth in the CC&R's is "compl[iance] in all respects with all of the provisions" of the unit lease and lease assignment—which would, of course, include the provisions for payment of

13

the assignment fee. By incorporating the owners' obligations under these other documents, Marina Pacifica's CC&R's imposed the obligation to pay the assignment fee just as surely as the unit lease and lease assignment did.

Moving to the remaining pertinent clause in the definition of transfer fee, the definition "requires a fee be paid upon transfer of the real property." (§ 1098.) Section 1039, in the same statutory scheme as section 1098,[5] defines "transfer" as "an act of the parties, or of the law, by which the title to property is conveyed from one living person to another." SCFC contends that, construing sections 1098 and 1039 together, section 1098 means a fee paid upon *the passing of title* to real property. Because an assignment of a leasehold estate does not pass title to real property, SCFC argues the assignment fee cannot qualify as a transfer fee.

This argument is unconvincing. It takes a too narrow view of the assignment fee without considering the reality of the whole transaction by which unit owners became "owners." It is true that, according to the unit lease, the assignment fee became operative when the limited partnership assigned the unit lease. The lease assignments between the limited partnership and the original unit owners therefore triggered the assignment fee. The lease assignments accomplished more than a simple assignment of the leasehold estate, however. The full title of the documents was "Assignment of Condominium Common Area and Unit Space Lease *and Grant Deed to Improvements on Leased Premises*." (Italics added.) The lease assignments granted the unit owners, as tenants in common, an undivided interest in all the improvements on the leased land. These improvements, consisting of the condominium buildings among other things, were real property. (§§ 658, 660; *Krouser v. County of San Bernardino* (1947) 29 Cal.2d 766, 769.) Consequently, the transaction did involve the passing of title to real property. This transfer of title to the improvements and the transfer of the leasehold estate were two necessary parts of the single transaction. There

---

[5]     Both section 1039 and section 1098 are part of the Civil Code, division 2 ("Property"), part 4 ("Acquisition of Property"), title 4 ("Transfer"). Section 1039 is part of chapter 1 ("Transfers in General") under title 4, while section 1098 is part of chapter 2 ("Transfer of Real Property") under title 4.

14

would have been no transfer of the leasehold estate unless a purchaser was buying title to the real property at the same time.

Attorney Dennis Hill represented the limited partnership when it developed Marina Pacifica. He created the legal structure for the project and drafted the relevant documents (e.g., the unit lease and lease assignment). As he described it: "I developed the concept of individual condominiums to be sold with a mixture of fee and leasehold interests. . . . [¶] . . . [¶] . . . The ground and the air space were leased. All the structural components, that's the house, the foundation and roof and all that, would be sold in fee." Hill described the assignment fee as "part of the overall consideration for transfer of the unit." The package of documents provided to each unit purchaser described the transaction in much the same way. The package began with the sentence: "Each Marina Pacifica residential condominium consists of a leasehold interest in land and air space and title to the residential buildings and other structural improvements situated upon and within said land and air space." Thus, the transaction both transferred title to real property and triggered the assignment fee.

As the trial court characterized it in the statement of decision, "[t]he original purchaser became obligated to pay the assignment fee upon the initial transfer of the unit from the developers to the purchaser." Lansdale's testimony was consistent with this idea that the assignment fee was triggered when the unit owners purchased their units. When asked whether "the purpose of the assignment fee in [his] mind was to compensate [him] for the opportunity to purchase the units at Marina Pacifica," he replied with an unqualified "[y]es." The undisputed evidence brought the assignment fee within the definition of a transfer fee under section 1098.

We do not think the language of the statute is ambiguous such that we must resort to legislative history to interpret it. Nevertheless, we note the assignment fee is so similar to an example in the legislative history that there can be little doubt the Legislature intended section 1098 to apply to a case like this. The only published decision to interpret section 1098 is *Fowler v. M&C Assn. Management Services, Inc.* (2013) 220 Cal.App.4th 1152

(*Fowler*).[6]  Examining the legislative history, the *Fowler* court explained that examples of transfer fees included a "fee of one-half of 1 percent of the sales price of homes going to a private land trust to buy other land to be held as open space, a transfer fee to fund community projects, open space and habitat preservation, and a transfer fee to fund homeless shelters.  The bill analysis also targeted some transfer fees that 'have also been used as a mechanism for the owner of a parcel of property to receive a steady stream of income from their property after it had been sold.'" (*Id.* at p. 1158.)  The assignment fee is just like this last example, a fee intended to provide a future, steady stream of income for the owner of property.  The unit lease made the fee "a continuing assignment fee" scheduled for monthly payment until the expiration date of the unit lease in 2041.  Reider, who owned 18.5 percent of the assignment fee income at one time, credited himself with the idea for the assignment fee and said that he conceived of the fee as "a nice, easy way to create a cash flow stream" for the limited partnership and its partners.

In sum, we think the assignment fee falls within the general definition of a transfer fee set forth in the first sentence of section 1098.  The remainder of section 1098, however, excludes certain fees from the definition.  We turn now to these exceptions.

*ii.  Substantial Compliance Exception to Definition of Transfer Fee*

Section 1098 exempts nine categories of fees from the definition of a transfer fee. (§ 1098, subds. (a)-(i).)  SCFC contends several of the exceptions apply in this case, including one we refer to as the substantial compliance exception.  We agree the substantial compliance exception applies and thus do not consider the remaining exceptions urged by SCFC.

Section 1098.5, subdivision (a), deals with the notice required to collect transfer fees after a certain date.  For fees imposed prior to January 1, 2008, the receiver of the fee had until December 31, 2008, to record against the real property "a separate document that meets all of the following requirements:"

---

[6]      *Fowler* dealt primarily with an exception to the definition of transfer fee that is not relevant for our purposes.  (*Fowler, supra*, 220 Cal.App.4th at p. 1156.)

"(1)  The title of the document shall be 'Payment of Transfer Fee Required' in at least 14-point boldface type.

"(2)  The document shall include all of the following information:

"(A)  The names of all current owners of the real property subject to the transfer fee, and the legal description and assessor's parcel number for the affected real property.

"(B)  The amount, if the fee is a flat amount, or the percentage of the sales price constituting the cost of the fee.

"(C)  If the real property is residential property, actual dollar-cost examples of the fee for a home priced at two hundred fifty thousand dollars ($250,000), five hundred thousand dollars ($500,000), and seven hundred fifty thousand dollars ($750,000).

"(D)  The date or circumstances under which the transfer fee payment requirement expires, if any.

"(E)  The purpose for which the funds from the fee will be used.

"(F)  The entity to which funds from the fee will be paid and specific contact information regarding where the funds are to be sent.

"(G)  The signature of the authorized representative of the entity to which funds from the fee will be paid."  (§ 1098.5, subd. (a).)

If the receiver of the transfer fee failed to record the required document by December 31, 2008, the receiver could not collect the fee on or after January 1, 2009. (§ 1098.5, subd. (a).)  None of the entities or individuals entitled to collect the assignment fee recorded the required document before December 31, 2008.

SCFC asserts it could still collect the fee after December 31, 2008, because the substantial compliance exception applies.  Pursuant to this exception, a transfer fee does not include "[a]ny fee reflected in a document recorded against the property on or before December 31, 2007, that is separate from any covenants, conditions, and restrictions, and that substantially complies with subdivision (a) of Section 1098.5 by providing a prospective transferee notice of the following:"

"(1)  Payment of a transfer fee is required.

"(2)  The amount or method of calculation of the fee.

17

"(3)  The date or circumstances under which the transfer fee payment requirement expires, if any.

"(4)  The entity to which the fee will be paid.

"(5)  The general purposes for which the fee will be used."  (§ 1098, subd. (i).)

In this case, the unit lease contains all of the above information in paragraph 4 of the document.  That paragraph sets forth the obligation to pay the assignment fee, the method for calculating the fee (1/12th of 10 percent of the fair market value of the land, minus the monthly rent payable), the fee's expiration date (the expiration of the leasehold term, or September 30, 2041), the entity to which the fee will be paid (the limited partnership, "or its order"), and the general purpose of the fee ("for and in consideration of" the limited partnership's assignment of its interest in the leasehold estate).

The unit lease itself was not recorded against the property.  But numerous documents recorded against the property incorporated the unit lease by reference, including the "Memorandum of Condominium Common Area and Unit Space Leases," the lease assignments, and the resale assignments.  The lease assignments or resale assignments were recorded against the respective units to which they related each time a unit changed hands.  The lease assignments and resale assignments contained provisions in which the unit owners promised to pay the assignment fee set forth in paragraph 4 of the unit lease.  Thus, the assignment fee was "reflected" in these documents recorded against the property on or before December 31, 2007.  (§ 1098, subd. (i).)

Moreover, these recorded documents provided notice of the necessary information in that they provided constructive notice of the contents of the unit lease.  Under the Civil Code, notice may be "actual" or "constructive."  (§ 18.)  Section 1098 does not restrict the type of notice the recorded document must provide, but simply uses the unqualified term "notice."  We presume the Legislature was aware of existing related laws and intended to sustain a consistent body of laws when enacting a statute.  (*Stone Street Capital, LLC v. California State Lottery Com.* (2008) 165 Cal.App.4th 109, 118.)  Because the Legislature did not limit the type of notice required by section 1098, either actual or constructive notice was sufficient under the plain language of the statute.

18

Actual notice consists of "express information of a fact," while constructive notice "is imputed by law." (§ 18.) One type of constructive notice is inquiry notice. That is, a person has constructive notice of a particular fact when the person has actual knowledge of circumstances sufficient to put a prudent person on inquiry as to the particular fact. (§ 19; *In re Marriage of Cloney* (2001) 91 Cal.App.4th 429, 436-437 ["'A person generally has "notice" of a particular fact if that person has knowledge of circumstances which, upon reasonable inquiry, would lead to that particular fact.'"].) Accordingly, when a recorded document refers to an unrecorded document, the recorded document provides constructive notice of the contents of the unrecorded document if a prudent inquiry would lead to the unrecorded document. (*Pacific Trust Co. Ttee v. Fidelity Fed. Sav. & Loan Assn.* (1986) 184 Cal.App.3d 817, 825; *American Medical International, Inc. v. Feller* (1976) 59 Cal.App.3d 1008, 1020.) A prudent person reading the lease assignment or resale assignment, and seeing that a purchaser was promising to pay an assignment fee as set forth in the unit lease, would inquire into the terms of the assignment fee obligation in the unit lease. Further, the HOA cannot seriously contend prospective purchasers did not have access to the unit lease. The parties stipulated at trial that each purchaser of a unit received a copy of the unit lease. Each purchaser also received the "information sheet" clearly stating the purchaser would owe a monthly assignment fee in addition to rent. The one-page information sheet stated the assignment fee would be readjusted on October 1, 2006, and October 1, 2021, in accordance with the fair market value of the leasehold premises on those dates, and directed the purchaser to the relevant paragraphs and page numbers of the unit lease. When the purchasers signed the lease assignment or resale assignment, they acknowledged they had received and reviewed the unit lease. The undisputed evidence shows the recorded documents provided constructive notice of the information required by the substantial compliance exception.

The circumstances here comply with the letter of the law, but they likewise conform to the spirit of the law. The Legislature enacted sections 1098 and 1098.5 to provide for "advance notification to buyers and sellers of 'a new type of transfer fee.'" (*Fowler*, *supra*, 220 Cal.App.4th at p. 1158.) One legislative analysis of the bill prior to enactment

explained "that '[i]n light of the novel transfer fees being created and the general lack of knowledge regarding those fees' [citation], the recording requirement was imposed to assure disclosure of such fees prior to home purchases." (*Ibid.*) The evidence we discuss in the foregoing paragraph shows that, far from being hidden, the assignment fee was clearly disclosed to purchasers. While the recorded documents provided constructive notice of the terms of the fee, the purchasers also had *actual* notice of the assignment fee based on the package of documents presented to them.

The substantial compliance exception takes the assignment fee outside the definition of a transfer fee. Hence, there is no bar under sections 1098 and 1098.5 to SCFC collecting the assignment fee after December 31, 2008. We shall reverse the portion of the judgment holding the assignment fee may not be assessed or enforced from and after January 1, 2009.

## b. The Trial Court Did Not Err in Determining the 4 Percent Formulation Applied[*]

SCFC also challenges the trial court's determination that the assignment fee should be calculated using the 4 percent formulation, contending the 10 percent formulation represents the correct interpretation of the unit lease. We disagree and affirm the trial court on this issue.

The court must interpret a contract to give effect to the mutual intent of the parties at the time they entered into the contract, to the extent their mutual intent is ascertainable. (§ 1636.) Whenever possible, the court should ascertain the mutual intent of the parties from the clear and explicit language of the contract alone, so long as the language does not involve an absurdity and the contract does not involve extrinsic fraud, mistake, or accident. (§§ 1638, 1639, 1640.) The court may consider parol evidence provisionally to determine whether the contract is ambiguous. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.) If the court determines the contract is not, in fact, clear and explicit, but is ambiguous, it may then admit the extrinsic evidence to assist in its ultimate interpretation of the contract. (*Ibid.*)

---

[*]    See footnote, *ante*, page 1.

The threshold determination of ambiguity is a question of law we review de novo. (*Winet v. Price, supra*, 4 Cal.App.4th at p. 1166.)  We review the trial court's interpretation of the contract de novo when the court did not use extrinsic evidence or the extrinsic evidence is not conflicting.  (*Ibid.*)  "When the competent parol evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld as long as it is supported by substantial evidence."  (*Ibid.*)

With regard to the threshold issue, the provision for calculating the assignment fee is ambiguous because it is reasonably susceptible to more than one meaning.  The unit lease stated:  "[T]he monthly assignment fee due and payable hereunder shall be equal to the amount, if any, by which one-twelfth (1/12) of ten percent (10%) of the fair market value of the leasehold premises on October 1, 2006 exceeds the monthly rental payable under part (b) of Paragraph 3 of this Lease."  The HOA argues this provision clearly means the rent described by paragraph 3.(b) of the unit lease must be deducted, whether or not the unit owners are actually obligated to pay it anymore.  SCFC argues this provision clearly means nothing must be deducted because there is no rent actually paid under the lease.  These differing interpretations, of course, mark the difference between the 4 percent formulation, which deducts the rental payment of 6 percent of the value of the land, and the 10 percent formulation, which deducts nothing from 10 percent of the value of the land.  The provision is reasonably susceptible to both interpretations, as thoroughly demonstrated by the parties' opposing arguments in their briefing.  "[M]onthly rental payable under part (b) of Paragraph 3" could mean the rent capable of being paid according to the formula in paragraph 3.(b), *or* it could mean the rent actually being paid.

The strongest evidence of the ambiguity is Lansdale's and SCFC's own conduct and that of their agent.  "[A] contract apparently unambiguous on its face may still contain a latent ambiguity that can only be exposed by extrinsic evidence.  [Citations.]  In this regard, predispute, postcontracting conduct is admissible to demonstrate an ambiguity."  (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1133.)  While defendants both now advocate for the 10 percent formulation, their past conduct suggested they took no issue with the 4 percent formulation, even after the HOA acquired the land from the

21

McGrath Trust and it became apparent the unit owners would no longer pay rent. Rufus Rhoades was Lansdale's attorney for over 30 years and was an officer and agent of SCFC until September 2010. Rhoades sent a letter to the HOA's counsel in 1999 in which Rhoades acknowledged the HOA and the McGrath Trust were finalizing the transaction. In the same letter, Rhoades stated: "[W]e are in full agreement with you on the issue of determining value. As you indicated, the question is how much will the property be worth in 2006? Once that amount is determined, running a present worth calculation *on the four percent figure* is not terribly difficult. Perhaps, with that problem in mind, we should defer any serious negotiations until we are a good deal closer to that year than we are now." (Italics added.) Rhoades's prelitigation, postcontracting statements in this letter indicate that he had the 4 percent formulation in mind, representing a deduction for the rent payable under paragraph 3.(b) despite the HOA's imminent acquisition of the property. In the appraisal litigation, Lansdale stipulated to certain facts for that trial, which took place in 2006. The stipulated facts acknowledged the HOA had acquired the land from the McGrath Trust in 1999 and the unit owners had, in turn, purchased an undivided interest in the land from the HOA. The stipulation also stated the assignment fee was the amount, if any, by which 1/12th of 10 percent of the fair market value of the land exceeded the rent payable under paragraph 3.(b) of the unit lease. In the very next sentence, the stipulation described the formula for calculating the rent in paragraph 3.(b)—that is, 1/12th of 6 percent of the fair market value of the land. The clear implication of setting these formulas side by side was that the 6 percent for the rent was relevant for determining how much would be left over for the assignment fee—4 percent of the land's fair market value.

Having determined the assignment fee provision is reasonably susceptible to both interpretations, we must now decide which one more perfectly represents the mutual intent of the parties. We are convinced, like the trial court, that the 4 percent formulation is the correct interpretation for several reasons. A court construes an ambiguity in a contract most strongly against the party who caused the ambiguity to exist—the drafter of the contract. (§ 1654; *Taylor v. J. B. Hill Co.* (1948) 31 Cal.2d 373, 374.) The courts apply this rule with particular force when the contract at issue is an adhesion contract. (*Badie v. Bank of*

*America* (1998) 67 Cal.App.4th 779, 801.)  Attorney Hill working on behalf of the limited partnership drafted the unit lease in its entirety, and in particular, the assignment fee provision.  The counter party to the unit lease was the McGrath Trust.  Counsel for the McGrath Trust accepted Hill's draft without change, as far as Hill recalled.  SCFC, as the entity that now holds the limited partnership's interest in the assignment fee, stands in the shoes of the limited partnership, which was the drafter.  The ambiguity should be construed most strongly against SCFC, especially because the assignment fee provision represented an adhesion contract.  (*Goddard v. South Bay Union High School Dist.* (1978) 79 Cal.App.3d 98, 105 ["An adhesion contract is a contract in which the party with superior bargaining power permits the other party to adhere to the contract or reject it, but does not permit an opportunity to bargain over its terms."].)  The HOA and the unit owners were not parties to the unit lease and did not have the opportunity to negotiate or provide input on the terms of the provision.  Payment of the assignment fee became the unit owners' obligation when they executed the lease assignment with the limited partnership.  But even with the lease assignment, the unit owners did not have the chance to change the terms of the assignment fee provision already set in stone by the unit lease.  They received the unit lease and the lease assignment as standardized forms in the package of documents given to all purchasers.  In order for a prospective purchaser to buy a unit, they had to simply agree to pay the assignment fee.

Additionally, substantial extrinsic evidence shows that even the drafter did not contemplate a situation in which the rent payment would be eliminated, thereby attributing the entire 10 percent of the land's fair market value to the assignment fee.  Hill testified the parties to the lease never contemplated that the unit owners would acquire ownership of the land, and he said the unit lease did not provide for such an occasion.  Similarly, Rhoades testified it "was almost beyond the pale in terms of foreseeability" that the McGrath Trust would sell its interest in the land to the unit owners.  The failure to contemplate the current circumstances makes sense in looking at the language of provision, which states the assignment fee is "for and in consideration of" assignment of the leasehold estate.  The contract presumes the existence of a leasehold estate to assign.  It seems the drafter, at the

time of contracting, thought the unit owners would always pay rent to some party, and the limited partnership (or its assignees) would merely receive whatever piece of the pie was left over after the rent was paid. In other words, the limited partnership never contemplated it would receive the entire 10 percent of the land's fair market value. If it did not have this circumstance in mind, it hardly could have communicated this intent to the HOA or the unit owners at the time the unit owners agreed to the lease assignment. And it is the objective, *mutual* intent of the parties on which we must base our interpretation, not the subjective, unexpressed intent of one party. (§ 1636; *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 960.) Essentially, SCFC wants us to decide not only that it intended the unit owners to pay a hugely increased fee for the leasehold estate after they acquired the estate through merger, but also that the unit owners knew of this intent and assented to it. Neither the record nor the relevant legal principles support this conclusion. In sum, we conclude, like the trial court, that the 4 percent formulation more perfectly represents the mutual intent of the parties and should be used to calculate the assignment fee.

## 2. The HOA's Cross-appeal[*]

The HOA advances three main arguments in its cross-appeal. First, it contends the trial court erred when it found SCFC's assessment of the assignment fee using the 10 percent formulation did not breach the unit lease or the implied covenant of good faith and fair dealing. Second, it argues the court erred in awarding prejudgment interest to SCFC. Last, it contends the court erred when it granted SCFC's motion for summary adjudication based on the statute of limitations.

### a. The HOA Was Entitled to Judgment Against SCFC on the Breach of Contract Cause of Action Only

The HOA asserts defendants assessed the assignment fee on or after October 1, 2006, using the 10 percent formulation, in breach of the unit lease's assignment fee provision, which provided for use of the 4 percent formulation. Thus, the HOA contends, both

---

[*] See footnote, *ante*, page 1.

defendants breached the unit lease and the covenant of good faith and fair dealing implied in the unit lease. We agree insofar as SCFC's billing using the 10 percent formulation breached the unit lease, but not the implied covenant. Lansdale, however, did not engage in such conduct, and no basis thus exists for finding he breached the contract.

Preliminarily, we note the decisive facts are not truly in dispute. When this is the case, we are confronted with a question of law we review de novo. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799.)

"The essential elements of a breach of contract claim are: '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff.'" (*Hamilton v. Greenwich Investors XXVI, LLC* (2011) 195 Cal.App.4th 1602, 1614.) The third element, defendant's breach, means the defendant failed to do something the contract required or did something the contract prohibited. (CACI No. 303.)

The parties stipulated SCFC began billing the unit owners in December 2008 using the 10 percent formulation. SCFC argues the assignment fee provision permitted it to bill the unit owners for the assignment fee, and it therefore did nothing prohibited. But we have determined the assignment fee provision meant a fee based on the 4 percent formulation. As a result, the provision prohibited SCFC from overbilling and collecting from the unit owners using the higher 10 percent formulation. SCFC additionally argues even if its conduct constituted breach, the unit owners have suffered no damages because the judgment ordered SCFC to refund the handful of unit owners who overpaid. This argument makes little sense. The court's order for SCFC to refund the unit owners is, if anything, an acknowledgement that some had suffered damage. The HOA instructed the unit owners not to pay SCFC's bill in 2008 and instead filed this litigation. Still, SCFC collected from some unit owners under the 10 percent formulation, and the court ordered it to give refunds totaling $33,816.47 in the judgment. While this sum may seem paltry relative to the amount the unit owners owed SCFC in arrearages and interest, it nevertheless constituted damage.

Billing and collecting at a rate other than as allowed under the contract breached the contract, but the HOA has not shown this conduct separately breached the covenant of good

25

faith and fair dealing. "'The essence of the good faith covenant is objectively reasonable conduct.' [Citation.] '[T]he covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive.'" (*Badie v. Bank of America, supra*, 67 Cal.App.4th at p. 796.) The HOA has not established SCFC's conduct was objectively unreasonable. As we discuss above, the assignment fee provision was reasonably susceptible to either of the parties' interpretations. In view of the ambiguity, we can hardly say SCFC acted unreasonably in urging one interpretation or the other. Moreover, the HOA seeks the same damages under this cause of action and the breach of contract cause of action (the amount that unit owners overpaid SCFC under the 10 percent formulation). When the allegations of breach of the implied covenant rely on the same acts and simply seek the same relief already claimed in a companion breach of contract cause of action, "they may be disregarded as superfluous as no additional claim is actually stated." (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1395.) Such is the case here.

SCFC further contends it cannot be liable for breach of contract or the implied covenant because the litigation privilege applies, consistent with the trial court's decision. "The litigation privilege precludes liability arising from a publication or broadcast made in a judicial proceeding or other official proceeding" and may, under certain circumstances, also apply to prelitigation communications. (*Digerati Holdings, LLC v. Young Money Entertainment, LLC* (2011) 194 Cal.App.4th 873, 888-889; see § 47, subd. (b).) But "the litigation privilege was founded on defamation actions, and has been applied primarily to provide absolute immunity from *tort* liability for communications with '"some relation"' to judicial proceedings." (*Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467, 1494.) Thus, "the privilege is generally described as one that precludes liability in tort, not liability for breach of contract." (*Navellier v. Sletten* (2003) 106 Cal.App.4th 763, 773.) "[W]hether the litigation privilege applies to an action for breach of contract turns on whether its application furthers the policies underlying the privilege." (*Wentland v. Wass* (2005) 126 Cal.App.4th 1484, 1492.)

"The 'principal purpose' of the litigation privilege 'is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort action.' [Citation.] The privilege 'promotes the effectiveness of judicial proceedings by encouraging "open channels of communication and the presentation of evidence" in judicial proceedings.' [Citation.] The privilege 'promotes the effectiveness of judicial proceedings by encouraging attorneys to zealously protect their clients' interests.' [Citation.] 'Finally, in immunizing participants from liability for torts arising from communications made during judicial proceedings, the law places upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result. [Citation.]' [Citation.] In summary, the purpose of the litigation privilege is to ensure free access to the courts, promote complete and truthful testimony, encourage zealous advocacy, give finality to judgments, and avoid unending litigation." (*Wentland v. Wass, supra*, 126 Cal.App.4th at p. 1492.)

SCFC completely fails to explain how applying the litigation privilege to the breach of contract claim furthers these policies. In our view, applying the privilege in this case would not further these policies. Even if SCFC sent its bills after trying to negotiate with the HOA and in anticipation of litigation, the claim was based not simply on the communicative act of sending a bill, but more importantly on collecting the overpayments. Indeed, it is the unauthorized amounts collected that represent the damages sought by the claim.[7] It is one thing to stake a position in litigation or in anticipation of litigation and articulate that position in an oral or written statement. These types of communicative acts

---

[7] SCFC contends it has not collected anything from the unit owners because the HOA has collected the money from them and is holding it in reserve. This matters not for our purposes. The HOA has acted as collection agent for the assignment fee holders before, from 2000 to 2007, and in the judgment, the court directed it to act as collection agent for SCFC in the future. The unit owners paid the money to satisfy SCFC's bill and were thus deprived of their money, regardless of whether SCFC holds their money or some other entity holds it for SCFC's benefit.

27

are classically privileged "publication[s] or broadcast[s]" under the litigation privilege. (§ 47.) It is another thing altogether to engage in a noncommunicative conduct that violates the terms of an agreement, such as taking payments to which one is not entitled. "The litigation privilege was never meant to spin out from judicial action a party's performance and course of conduct under a contract." (*Stacy & Witbeck, Inc. v. City and County of San Francisco* (1996) 47 Cal.App.4th 1, 8.) Put another way, the HOA's breach of contract claim is based in large part on conduct that does not qualify as a "publication or broadcast" (§ 47, subd. (b)). Such conduct is not protected by the litigation privilege. The judgment shall be reversed to the extent it finds in favor of SCFC on the breach of contract cause of action.

**b.  The HOA Forfeited Its Prejudgment Interest Argument, But Even If It Had Not, No Error Occurred**

The HOA's next main argument is that the court erred in awarding SCFC prejudgment interest. The judgment set forth the amounts the unit owners owed under the 4 percent formulation from October 1, 2006, to December 31, 2008, and stated: "On all amounts owing, including payments to SCFC and refunds of overpayments from SCFC, pre-judgment interest shall accrue and be payable at the rate of 7% (seven percent) per annum." SCFC argues the HOA has forfeited this argument, and we agree.

Based on the parties' competing proposed judgments, the court determined they disagreed on whether prejudgment interest applied, and the court referred the issue to the referee. In point of fact, it is the referee's finding at issue here. The referee determined prejudgment interest applied to the amounts owing to SCFC for the assignment fee. Any party may file objections to a referee's report or recommendations, and the trial court shall review any objections filed. (Code. Civ. Proc., § 643, subd. (c).) The HOA filed objections to the referee's findings, but it did not register an objection to the referee's prejudgment interest finding. In fact, the HOA expressly stated in its memorandum of points and authorities supporting the objections: "The Association *does not object* to the Referee's major findings: (1) award of pre-judgment interest for the payments declared owed by the Homeowners . . . ." (Italics added.) The court went on to adopt the referee's prejudgment

interest finding. "The failure to file a written objection to the contents of the referee's report or to properly move to set aside the report results in the waiver of the right to object to the referee's findings." (*Martino v. Denevi* (1986) 182 Cal.App.3d 553, 557.) The HOA has therefore forfeited its argument by failing to object to the referee's finding below.

Even if the HOA had not forfeited the issue, we would hold the award of prejudgment interest was proper. The referee's report and recommendation found prejudgment interest appropriate for two reasons. First, he found: "Prejudgment interest shall be awarded pursuant to paragraph 4 of the [unit lease], which provides as follows: 'Any payment of the base assignment fee which shall not be paid when due shall bear interest at the rate of seven percent (7%) per annum from the date when due and payable by the terms of this Paragraph 4 until same shall be paid.'" Second, the referee found notwithstanding that the assignment fee provision expressly authorized prejudgment interest, prejudgment interest would also be proper under section 3287, subdivisions (a) and (b). Section 3287 provides a statutory basis for recovering prejudgment interest when a person "is entitled to recover damages certain, or capable of being made certain by calculation" and the right to recovery vested upon a particular day from which prejudgment interest may be calculated. In such cases of "damages certain," the claimant is entitled to prejudgment interest as a matter of right. (§ 3287, subd. (a); *Leaf v. Phil Rauch, Inc.* (1975) 47 Cal.App.3d 371, 376.) The section also gives the court discretion to order prejudgment interest on an unliquidated contract claim, that is, when the damages were uncertain. (§ 3287, subd. (b).)

The HOA argues on appeal that SCFC was not entitled to prejudgment interest under section 3287, either as a matter of right or of discretion. But section 3287 is irrelevant when a person has a contractual right to prejudgment interest, as the referee found SCFC did here. (*Roodenburg v. Pavestone Co., L.P.* (2009) 171 Cal.App.4th 185, 191-192 ["Under the express terms of the Operating Agreement, Pavestone is obligated to pay interest on any amount not paid within 30 days of a triggering event. Hence, plaintiffs need not resort to Civil Code section 3287, subdivision (a), to obtain prejudgment interest. The obligation to pay interest on any amount ultimately determined to be owed is no less enforceable than the

obligation to pay the value of the capital account or the severance payment."].) The HOA fails to establish why this primary basis for the referee's finding was error.

**c. The Court Did Not Err in Granting Summary Adjudication Based on the Statute of Limitations**

The HOA lastly argues the trial court erred in granting summary adjudication on statute of limitations grounds. The court granted summary adjudication as to all claims that the assignment fee was void from its inception (in the early 1970's) and all claims running from the merger of estates in 1999. We are not persuaded the court erred.

We review the trial court's order granting summary adjudication under the de novo standard. (*Angelica Textile Services, Inc. v. Park* (2013) 220 Cal.App.4th 495, 504.) A defendant may meet his or her burden on summary adjudication by establishing an affirmative defense as a matter of law. (Code Civ. Proc., § 437c, subd. (f)(1); *Angelica Textile Services, Inc. v. Park, supra*, at p. 504.)

The causes of action on which the court granted summary adjudication seek a declaration that the original assignment fee was a forced gift or invalid for lack of consideration (ninth cause of action), a declaration that the merger of estates extinguished the obligation to pay the assignment fee (10th cause of action), a declaration that the assignment fee was an unconscionable surprise when the original unit owners executed their agreements (14th cause of action), and restitution based on both the forced gift and merger of estates theories (11th and 12th cause of action). The HOA characterizes the causes of action at issue as those challenging the validity and enforceability of the original assignment fee, which existed from the unit lease's 1973 creation to December 1999, and those challenging the postmerger assignment fee, which emerged in December 1999 when the unit owners purchased the land from the McGrath Trust.

The parties agree the four-year statute of limitations for actions upon a contract applies to these causes of action. (Code Civ. Proc., § 337.) The HOA filed its original complaint on March 23, 2009. Causes of action accruing before March 23, 2005, were thus time-barred, absent some reason for tolling the statute of limitations. (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 747.) The HOA makes three arguments: (1) The

causes of action did not accrue until December 2008; (2) the discovery rule tolled the statute of limitations; and (3) the doctrine of equitable estoppel tolled the statute of limitations. All these arguments lack merit.

### i. Accrual

"'The fundamental basis of declaratory relief is the existence of an *actual, present controversy* over a proper subject.'" (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79.) The HOA contends there was no actual, present controversy over whether the original assignment fee and postmerger assignment fee were enforceable until SCFC attempted to "re-write" the assignment fee in December 2008 by billing with the 10 percent formulation. According to the HOA, no declaratory relief causes of action were ripe for decision until this so-called rewrite occurred. This is nonsense.

"Generally, a cause of action accrues when, under the substantive law, the wrongful act is done and liability arises, i.e., when a suit may be brought." (*Menefee v. Ostawari* (1991) 228 Cal.App.3d 239, 245.) In the summary adjudication proceedings, the undisputed evidence showed that all unit owners were informed of the assignment fee, the original unit owners all had uniform lease assignments obligating them to pay the assignment fee, and the original and succeeding unit owners had paid the assignment fee continuously since the fee's inception in 1973. If the unit owners had been paying the original assignment fee since 1973 and were not receiving any consideration in return, as the HOA alleges, the "wrongful act" was complete back then. There was nothing stopping the HOA from bringing an action in the 1970's for a declaration that the assignment fee was a forced gift or invalid for lack of consideration.[8] The controversy was ripe as early as the 1970's, and the cause of action accrued then, whether the HOA chose to act on it or not.

Similarly, the controversy as to the merger of estates existed since 1999. It was undisputed in the summary adjudication proceedings that the HOA purchased the land from the McGrath Trust in 1999, and following that, the unit owners purchased their interests in the land from the HOA. This was the circumstance that merged the leasehold estate and the

---

[8] Defendants proffered undisputed evidence that the HOA had existed since 1976.

31

landlord estate, thereby extinguishing the leasehold estate. (*Strike v. Trans-West Discount Corp.* (1979) 92 Cal.App.3d 735, 742.) If the merger arguably extinguished the obligation to pay the assignment fee, and the unit owners indisputably were still paying it in 1999 and after, the wrongful act occurred as early as 1999. Again, there was nothing stopping the HOA from bringing an action in 1999 or soon thereafter for a declaration that the assignment fee obligation was extinguished with the merger of estates. Contrary to the HOA's contention, these causes of action accrued long before December 2008.

*ii. Discovery Rule*

"The discovery rule protects those who are ignorant of their cause of action through no fault of their own. It permits delayed accrual until a plaintiff knew or should have known of the wrongful conduct at issue." (*April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 832.) The HOA contends it did not know the basis for the invalidity or unenforceability of the original assignment fee and the postmerger assignment fee until the appraiser litigation ended in 2008. In particular, it relies on the fact that it was the decision in the appraisal litigation that held the leasehold estate was merged and extinguished, and the appraisal litigation did not end until 2008. It suggests it could not have known of the merger until the court's decision.

But the discovery rule is concerned with the plaintiff's knowledge of *facts* essential to their cause of action, as opposed to the legal theories underlying the cause of action. (*Gutierrez v. Mofid* (1985) 39 Cal.3d 892, 897.) "It is irrelevant that the plaintiff[s] [are] ignorant of [their] legal remedy or the legal theories underlying [their] cause of action." (*Id.* at p. 898.) The undisputed evidence showed the HOA and the unit owners purchased the land from the McGrath Trust in 1999. They can hardly claim they did not know of the purchase in 1999. The undisputed evidence also showed they continued to pay the assignment after 1999. The *legal effect* of the purchase—that is, the merger of estates—is not a *fact* for purposes of the discovery rule. As a result, even assuming the HOA or the unit owners were truly ignorant of the legal effect of the purchase, that ignorance cannot toll the statute of limitations under the rule. As early as 1999, they knew the facts necessary to bring a cause of action arguing the estates had merged.

*iii. Equitable Estoppel*

Equitable estoppel arises when some conduct by the defendants, relied on by the plaintiffs, induces the belated filing of an action. (*Spray, Gould & Bowers v. Associated Internat. Ins. Co.* (1999) 71 Cal.App.4th 1260, 1267-1268.) The essential elements of equitable estoppel are (1) the defendants knew the operative facts; (2) they intended that the plaintiffs rely on their conduct, or they acted so that the plaintiffs had the right to believe the defendants intended to induce reliance; (3) the plaintiffs were ignorant of the true state of facts; and, (4) the plaintiffs relied on the defendants' conduct to their injury. (*Olofsson v. Mission Linen Supply* (2012) 211 Cal.App.4th 1236, 1245.)

The HOA asserts there was a genuine issue of material fact as to equitable estoppel. It argues the limited partnership drafted the unit lease to obscure the alleged lack of consideration for the fee. Moreover, it argues, the defendants obscured the true nature of the assignment fee in their billings and communications with the unit owners by referring to the assignment fee as "rent" or grouping it with the rent, not disclosing that the assignment fee was separate and independent from the rent. The HOA maintains it was only in 2009 and 2010 that Attorney Rhoades (for SCFC) and Reider (a former recipient of assignment fee payments) exposed the true nature of the assignment fee. They stated in various situations that the unit owners received nothing of value in exchange for the assignment fee, and the assignment fee was merely an income stream for the limited partnership and its successors. The HOA suggests this purported obfuscation by defendants or their agents caused the HOA to delay bringing suit until it knew the "true" facts.

We disagree that this evidence created a genuine issue of material fact on equitable estoppel. Specifically, there can be no genuine dispute about the unit owners' knowledge of the operative facts. The party asserting equitable estoppel must be "actually and permissibly" ignorant of the true state of facts. (*Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 584.) The HOA and unit owners were not ignorant of the true state of facts, according to the undisputed evidence. As a result, the third element of equitable estoppel cannot be satisfied, and there can be no estoppel if even one element is lacking. (*Ibid.*)

The unit lease clearly identified the assignment fee as a separate and independent obligation paid to the limited partnership, not the landowner.  They were set forth in entirely different paragraphs, one entitled "**Rental**" and one entitled "**Assignment Fee to Marina Pacifica**."  Further, the assignment fee provision clearly stated the fee was for and in consideration of the limited partnership's assignment of the leasehold estate to unit owners, while the rent was "for the use and enjoyment of the leasehold premises."  Regardless of what Rhoades or Reider may have said about the assignment fee in 2009 or 2010, and whether billings grouped the assignment fee with the rent, the unit lease explained the true state of facts about the assignment fee in 1973.  This includes that it was an income stream for the limited partnership.  The unit lease makes no secret of the fact that the monthly assignment fee payments were going to the limited partnership (in exchange for it assigning its leasehold estate).  Neither the unit lease nor any other document brought to our attention declares that the limited partnership would use the assignment fee income for anything in particular.  Why it should come as a surprise that the limited partnership simply considered the payments income is unclear.

From the very first, unit owners were informed of the assignment fee as a separate obligation paid to the limited partnership in exchange for assignment of the leasehold estate.  They were not, therefore, ignorant of the true state of facts, even if later statements from defendants or their agents were inconsistent in characterizing the assignment fee as "rent."

In sum, we are not persuaded the trial court erred in granting summary adjudication on the ninth, 10th, 11th, 12th, and 14th causes of action.

## DISPOSITION

The judgment is affirmed in part and reversed in part.  We reverse the judgment to the extent it holds the assignment fee is an uncollectible transfer fee after December 31, 2008, under sections 1098 and 1098.5.  We also reverse the judgment for SCFC, but not Lansdale, on the breach of contract cause of action, and direct the court to enter judgment for the HOA against SCFC on this cause of action.  The matter is remanded to the trial court for it to conduct further proceedings as necessary to enter an amended judgment consistent with this opinion, which judgment may include amended amounts due and owing for the

34

assignment fee.  In all other respects, the judgment is affirmed.[9]  Each party is to bear its own costs on appeal.


                                        FLIER, J.

WE CONCUR:



        BIGELOW, P. J.



        GRIMES, J.

---

**9**     Defendants have filed objections to and a motion to strike materials from the HOA's appendix on the ground that these materials are unnecessary for proper consideration of the issues.  Alternatively, defendants have filed a request for judicial notice, to the extent we deny the motion to strike.  Defendants' motion to strike is denied; their request for judicial notice is granted.