Filed 2/5/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MARINA PACIFICA HOMEOWNERS ASSOCIATION,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>SOUTHERN CALIFORNIA FINANCIAL CORPORATION,<br><br>Defendant and Appellant. | B276719<br><br>(Los Angeles County Super. Ct. No. NC052700) |

APPEAL from an order of the Superior Court of Los Angeles County.  Michael P. Vicencia, Judge.  Affirmed.

Locke Lord, Susan A. Kidwell, Daniel A. Solitro; Lewis Brisbois Bisgaard & Smith and Christopher J. Bakes for Plaintiff and Appellant.

Greenberg Traurig, Scott D. Bertzyk, Adam Siegler and Matthew R. Gershman for Defendant and Appellant.

———————————————

**SUMMARY**

Both plaintiff and defendant appeal from a postjudgment order concluding neither of them was the prevailing party in litigation over an assignment fee, and consequently neither of them was entitled to attorney fees under Civil Code section 1717 (section 1717) or to costs under Code of Civil Procedure section 1032 (section 1032).  We affirm the trial court's order.

**FACTS**

This is the fifth appeal in litigation over the assignment fee that began in 2006.  Three of the previous appeals are pertinent in one way or another to this appeal, and we will describe them as needed.[1]  The history of the dispute is described in detail in *Marina Pacifica Homeowners Assn. v. Southern California Financial Corp.* (2014) 232 Cal.App.4th 494, 497-504 (*Marina Pacifica I*).  We summarize here the background and other facts pertinent to the attorney fee and costs issues the parties present in this appeal, borrowing liberally from the recitations in our earlier opinions.

The plaintiff is Marina Pacifica Homeowners Association.  When unit owners in the Marina Pacifica complex in Long Beach purchased their units, they bought an ownership interest in their individual units and a share of an undivided leasehold interest in the land on which the complex was built.  That leasehold interest included the obligation to pay monthly rent to the landowner and

---

[1]     The first appeal concerned the process for selection of an appraiser to determine the fair market value of the property for purposes of adjustment of the assignment fees in 2006. (*Lansdale v. Marina Pacifica Homeowners Assn.* (Aug. 14, 2007, B192520) [nonpub. opn.].)

an assignment fee to the developers.  These two obligations were to continue until 2041.  Both payments were to be nominal until 2006, when the rent and assignment fee would be recalculated so that together they would equal 10 percent (on an annual basis) of the fair market value of the land underlying the units.  (*Marina Pacifica I, supra,* 232 Cal.App.4th at pp. 497-498.)  Thus the unit lease provided that as of October 2006, monthly rent would become the greater of (1) $25 or (2) one-twelfth of 6 percent of the fair market value of the leasehold premises.  (*Id.* at p. 498.)  The monthly assignment fee would " 'be equal to the amount, if any, by which one-twelfth (1/12) of ten percent (10%) of the fair market value of the leasehold premises on October 1, 2006 exceed[ed] the monthly rent payable under' " the unit lease. (*Ibid.*)  Another recalculation would occur as of October 1, 2021. (*Id.* at p. 499.)

In 1999, plaintiff bought the land underlying the development and sold pro rata shares to the individual unit owners, thus terminating rent payments under the unit leases. The assignment fee, however, created a separate contractual obligation from the unit owner to the developers.  (*Marina Pacifica I, supra,* 232 Cal.App.4th at pp. 499, 498.)

In 2000, plaintiff bought out the assignment fee rights of two of the three development partners.  But the remaining partner, William Lansdale, retained his 43.75 percent interest in those fees.  In 2005, Mr. Lansdale and plaintiff began to litigate disputes over the appraisal process that would determine the fair market value of the property for purposes of readjustment of the assignment fee.  (*Marina Pacifica I, supra,* 232 Cal.App.4th at p. 499.)

3

In 2007, the Legislature enacted Civil Code sections 1098 and 1098.5 to regulate "transfer fees." A transfer fee was defined broadly to include fees imposed in any document affecting the transfer of an interest in real property. For transfer fees imposed before January 1, 2008, the recipient of the fee was required to record a separate document meeting specified requirements. In order to continue collecting transfer fees on and after January 1, 2009, this separate document had to be recorded on or before December 31, 2008. (§ 1098.5, subd. (a).) There were, however, nine exceptions to the definition of a transfer fee. One of these exceptions was for fees in documents recorded by December 31, 2007, that met specified requirements and that also substantially complied with certain statutory provisions concerning notice to the prospective transferee and other items. (Former § 1098, subd. (i).)

In January 2008, Mr. Lansdale transferred his right to the assignment fees to defendant. By December 2008, the appraisal litigation had been concluded, an arbitration had been held, and the fair market value of the property for purposes of calculating the assignment fee was set at $60,615,500. Defendant began billing the unit owners for their respective shares of the readjusted assignment fee. Defendant did not record the separate document described in Civil Code section 1098.5. (*Marina Pacifica I, supra,* 232 Cal.App.4th at pp. 500-501.)

Defendant billed the unit owners using a "10 percent formulation." This formulation took advantage of the fact that unit owners, having purchased the land, no longer paid rent to the landowner. So, defendant charged a monthly assignment fee calculated as 10 percent of $60,615,500 (the fair market value) divided by 12, minus zero (rather than minus the 6 percent the

4

unit owners would have paid to the landowner had they not bought the land). In other words, defendant would receive 10 percent rather than the 4 percent it would have received if the unit owners had not purchased the land and eliminated their rent payments.

Plaintiff instructed unit owners not to pay the assignment fee bills defendant sent, and in March 2009 plaintiff sued defendant. Plaintiff's operative complaint alleged numerous causes of action for declaratory relief, breach of contract, breach of the covenant of good faith and fair dealing, reformation, and restitution. As we stated in *Marina Pacifica I*, "[t]he gravamen of the [complaint was] that the assignment fee is invalid or unenforceable for several reasons, or assuming it is valid and enforceable, [defendant's] billing vastly overstated the amount owing." (*Marina Pacifica I, supra,* 232 Cal.App.4th at p. 501.)

Plaintiff's claims that the assignment fee was void from its inception or from a merger of estates in 1999 were eliminated by summary adjudication. The court bifurcated the trial of the remaining issues into several phases. The phases tried first concerned (1) the remaining arguments that the assignment fee was invalid (principally because of the transfer fee statute), and (2) the proper calculation of the assignment fee, if it was valid. (*Marina Pacifica I, supra,* 232 Cal.App.4th at p. 502.)

### The trial court's July 23, 2013 judgment

The trial court's statement of decision and the later judgment presented "mixed results" for the parties. (*Marina Pacifica I, supra,* 232 Cal.App.4th at p. 502.) The trial court held the assignment fee was a transfer fee, and could not be collected after December 31, 2008, because defendant did not comply with recording requirements. (*Id.* at pp. 502-503.) And, the trial court

5

held the fees imposed before that date should have been calculated based on 4 percent of the fair market value rather than the 10 percent formulation (but nevertheless found this did not amount to a breach of contract). (*Id.* at pp. 503-504.) In addition, the trial court held the escalation in the assignment fee in 2006 and 2021 did not fail for lack of consideration. The judgment set forth the amounts owing to defendant for each unit owner under the 4 percent formulation. (*Id.* at p. 504.)

**The trial court's order on fees and costs**

The parties then filed motions for fees and costs. The trial court held that as between plaintiff and defendant, there was no prevailing party on the contract. "[The trial court] did 'not make this finding lightly, and [did] so after careful deliberation.' Both parties' claims to prevailing party status had some merit, which was why the decidedly mixed result in the litigation resulted in no clearly prevailing party as between the two. On the one hand, [plaintiff] achieved 'a primary goal' in the holding that the assignment fee was a transfer fee and not collectible after December 31, 2008. As well, it prevailed in its position that the 4 percent formulation controlled the calculation of the fee. But it mostly failed in its larger challenge to the assignment fee from its inception in the 1970's or the merger of estates in 1999. On the other hand, [defendant] obtained a substantial monetary award for unpaid assignment fees through December 31, 2008, because many unit owners had not paid the fee for years while the controversy was ongoing. But [defendant's] recovery was still significantly less than the amount it claimed under the 10 percent formulation." (*Marina Pacifica Homeowners Assn. v. Southern California Financial Corp.* (Mar. 4, 2016, B255413) [nonpub. opn.] (*Marina Pacifica II*).)

6

## The appeals and cross-appeals

Defendant appealed and plaintiff cross-appealed from the judgment on the merits. This court reversed the trial court's judgment to the extent it held the assignment fee was an uncollectible transfer fee after December 31, 2008. We affirmed the trial court's ruling that defendant should have used the 4 percent formulation to calculate the fees, and held that defendant breached the unit lease by not doing so. We remanded the case for proceedings to amend the judgment accordingly, including "amended amounts due and owing for the assignment fee." (*Marina Pacifica I, supra,* 232 Cal.App.4th at pp. 512-513.)

Meanwhile, plaintiff had appealed from the trial court's attorney fee order and defendant cross-appealed. We concluded that our disposition of the merits appeal "require[d] reconsideration of the prevailing party." (*Marina Pacific II, supra,* B255413.) We explained: "Our disposition reversed the judgment in a few key respects. We reversed the determination that [defendant] could not collect the assignment fee after December 31, 2008, and remanded for further proceedings to determine the revised amounts owed to [defendant]. We also reversed the judgment for [defendant] on the breach of contract cause of action. In other words, we improved the outcome for [defendant] in one respect, and worsened it another respect." (*Ibid.*) We declined defendant's invitation to determine it was the prevailing party, and remanded for the trial court's exercise of its discretion on that point. (*Ibid.*)

### The amended judgment

Shortly before we decided *Marina Pacifica II* (remanding the attorney fee and costs issues), the trial court (Judge Vicencia) issued its 97-page amended judgment on the merits.[2]

As required by our opinion in *Marina Pacifica I*, the December 28, 2015 amended judgment found defendant breached the unit lease by assessing the fee using the 10 percent formulation, ordered defendant to refund any excess payments made by homeowners, and found no statutory bar to collecting the assignment fee after December 31, 2008, and through September 30, 2041. The judgment specified the 4 percent rate for calculation of the assignment fee, and specified the monthly fee by unit number for the 570 units for October 1, 2006, through September 30, 2021. It also specified the 4 percent rate for assignment fees from October 1, 2021, through September 30, 2041. All other claims asserted against defendant and defenses asserted by defendant were denied. The amended judgment declared amounts collectible and payable to defendant, by homeowner, for fee amounts owed before January 1, 2009, including prejudgment interest, and also listed homeowners who

---

[2] Plaintiff appealed from the amended judgment, contending, based on recently enacted clarifying legislation amending the statute, that we erred in our earlier construction of the statute, and should correct that error and declare the assignment fee uncollectible. We concluded otherwise, finding the amended statute and its legislative history demonstrated the Legislature intended to permit the *Marina Pacifica I* assignment fees to remain in place. (*Marina Pacifica Homeowners Assn. v. Southern California Financial Corp.* (2017) 11 Cal.App.5th 54, 57 (*Marina Pacifica III*).)

had paid all assignment fee amounts owed through January 1, 2009. The judgment then declared, by homeowner, the amounts collectible and payable to defendant for fee amounts owed from January 1, 2009, through October 31, 2015.

The judgment further stated that: "To the extent this Final Judgment declares amounts presently owing, it is enforceable as a money judgment. To the extent this Final Judgment declares [defendant's] rights to receive payments in the future, any such payments shall be deemed ordered by and payable pursuant to this Final Judgment."

### The current dispute

After the trial court entered the amended judgment, both parties again filed motions for attorney fees and costs, both claiming to be the prevailing party.

Plaintiff argued it was the prevailing party because the amended judgment found defendant breached the unit lease by assessing the assignment fee using the 10 percent formulation. That is, defendant attempted to collect $97 million in assignment fees, "an overcharge of $58 million to which they were not entitled" under the lease; plaintiff was "the *non-breaching party* and prevailed in its suit to enforce collection at the 4% rate."

Defendant argued it was the prevailing party for several reasons: First, the judgment "establish[ed] its present right to approximately $12 million, and future right to continuing [assignment] fees worth a minimum of $27 million more – and, depending on the results of a 2021 reappraisal . . . , tens of millions of dollars more than that." Second, the judgment "exceeded the terms on which it was willing to settle early on." Third, defendant's loss on "the 10% position[] does not change things at all," because defendant obtained "a lopsided result" and

9

comparatively greater relief than plaintiff.  Fourth, comparison of the July 2013 judgment (where defendant was owed about $2.5 million with no right to collect assignment fees from January 1, 2009) with the amended judgment (where defendant is owed $9.5 million in addition to the $2.5 million, and has a right to collect "at least $27 million more going forward") showed the results were no longer "sufficiently mixed" so as to justify a finding of no prevailing party.

The parties also both filed memoranda seeking to recover their respective costs.  Plaintiff then filed a motion to strike or tax defendant's costs, to which defendant filed an opposition and plaintiff filed a reply.

After thoroughly discussing the issues with counsel at the hearing, the trial court found there was no prevailing party for purposes of either an award of attorney fees or an award of costs.

Defendant filed an appeal and plaintiff filed a cross-appeal.

## DISCUSSION

### 1. Defendant's Appeal of the Attorney Fee Order

Defendant contends it "achieved all its dominant litigation objectives" and therefore was the prevailing party for attorney fee purposes as a matter of law.  And, "even if the trial court had some discretion, it would have been an abuse of discretion to deny [defendant] its due," because defendant's "10% position was asserted defensively[.]"  Further, defendant argues that "[o]n costs, the judgment indisputably gave [defendant] a 'net monetary recovery,' " entitling defendant to costs " 'as a matter of right.' "  We disagree with defendant's contentions.

#### a. The legal principles

The principles governing a court's determination of the prevailing party under a contractual attorney fee provision are

10

explained in *Hsu v. Abbara* (1995) 9 Cal.4th 863 (*Hsu*). "When a contract contains a provision granting either party the right to recover attorney fees in the event of litigation on the contract, . . . section 1717 . . . gives the 'party prevailing on the contract' a right to recover attorney fees . . . . It defines the phrase 'party prevailing on the contract' as 'the party who recovered a greater relief in the action on the contract,' and it provides that a trial court 'may also determine that there is no party prevailing on the contract for purposes of this section.' " (*Id.* at p. 865.)

Hsu construed the statutory language providing that the trial court may determine there is no party prevailing on the contract. (*Hsu, supra,* 9 Cal.4th at p. 874.) The court described the history of section 1717, and observed that the language at issue "was declaratory of existing law." (*Hsu,* at p. 874.) The court cited earlier Court of Appeal cases recognizing "that the results of litigation may be so equivocal as to permit or even require that no party be found to have prevailed for purposes of attorney fees under section 1717." (*Ibid.*)

Hsu then observed that under the current statute, "the appellate courts have continued to recognize the trial court's authority to determine that there is no party prevailing on the contract for purposes of contractual attorney fees," and for the most part these were "cases in which the opposing litigants could each legitimately claim some success in the litigation." (*Hsu, supra,* 9 Cal.4th at p. 875.) The court expressly approved appellate court cases construing section 1717 as follows:

"As one Court of Appeal has explained, '[t]ypically, a determination of no prevailing party results when both parties seek relief, but neither prevails, or when the ostensibly prevailing party receives only a part of the relief sought.' [Citation.] By

11

contrast, when the results of the litigation on the contract claims are *not* mixed--that is, when the decision on the litigated contract claims is purely good news for one party and bad news for the other--the Courts of Appeal have recognized that a trial court has no discretion to deny attorney fees to the successful litigant. Thus, when a defendant defeats recovery by the plaintiff on the only contract claim in the action, the defendant is the party prevailing on the contract under section 1717 as a matter of law. [Citations.]  Similarly, a plaintiff who obtains all relief requested on the only contract claim in the action must be regarded as the party prevailing on the contract for purposes of attorney fees under section 1717.  [Citations.]"  (*Hsu, supra,* 9 Cal.4th at pp. 875-876.)

This construction of the statute, *Hsu* tells us, effectuates legislative intent, "allowing those parties whose litigation success is not fairly disputable to claim attorney fees as a matter of right, while reserving for the trial court a measure of discretion to find no prevailing party when the results of the litigation are mixed. [¶]  Accordingly, we hold that in deciding whether there is a 'party prevailing on the contract,' the trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources.  The prevailing party determination is to be made only upon final resolution of the contract claims and only by 'a comparison of the extent to which each party ha[s] succeeded and failed to succeed in its contentions.'  [Citation.]" (*Hsu, supra,* 9 Cal.4th at p. 876.)  The court also agreed "that *in determining litigation success,* courts should respect substance rather than form . . . ."  (*Id.* at p. 877.)

12

### b. Contentions and conclusions

According to defendant, *Hsu*'s holding was "that (i) where a party has achieved all its dominant litigation objectives, it is a prevailing party as a matter of law, and (ii) in such a circumstance, the trial court has no discretion to deny fees[.]" As is apparent from our recitation above, *Hsu* said nothing of the kind.

*Hsu* held that the defendant was "the party prevailing on the contract as a matter of law" if the trial court "renders a simple, unqualified decision in favor of the defendant on the only contract claim in the action." (*Hsu, supra,* 9 Cal.4th at pp. 865-866.) That did not happen here. Indeed, defendant here was found to have breached the contract by charging assignment fees calculated at 10 percent rather than 4 percent of fair market value. That is not an "unqualified decision in favor of the defendant[.]" (*Id.* at p. 865.) Nor does the *Hsu* court ever mention "dominant" litigation objectives.

That brings us to the only relevant question here, which is whether the trial court abused its discretion when it found there was no "party prevailing on the contract" for purposes of section 1717. We think not.

As *Hsu* tells us, the trial court was required to compare the relief awarded on the contract claims with "the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources." (*Hsu, supra,* 9 Cal.4th at p. 876.) Several points for and against each side are pertinent to the required comparison.

There is no doubt plaintiff sought throughout the litigation to rid the homeowners of the burden of the assignment fee in its entirety. In this it failed completely. If that were the whole

13

story, defendant would be the prevailing party.  But it is not the whole story.

Plaintiff's lawsuit, filed March 23, 2009, was preceded by defendant's billing of the assignment fees, beginning in December 2008.  Defendant billed at 10 percent of fair market value instead of 4 percent – a huge overcharge, two and a half times what it should have charged.  Plaintiff claims victory in preventing defendant from charging the assignment fee based on the 10 percent formulation at $58 million, telling us that while the judgment declares that $39 million in fees are collectible under the contract, that is $58 million less than the amount defendant claimed under the 10 percent formulation.

Defendant claims victory in establishing the propriety of the assignment fee at "easily $40 million over time," pointing out the judgment establishes defendant's "present entitlement to more than $12 million in arrearages, and to easily $27 million more through 2041[.]"

Defendant does not dispute the judgment is $58 million less than the amount defendant claimed.  But defendant says plaintiff's success on the 10 percent/4 percent issue counts for nothing, because defendant "consistently had offered to abandon" the 10 percent formulation, which was "only a defensive issue[.]" (Indeed, defendant asserts that "a 4% outcome was [defendant's] dominant litigation objective[.]")  To support this notion, defendant points to a letter it sent to homeowners before plaintiff filed suit, plus four settlement communications exchanged between the parties around the time of the March 2011 trial.  Defendant also relies on *Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21 (*Ajaxo*), asserting that "if the plaintiff in

14

*Ajaxo* was a prevailing party, [defendant] is too." Neither the record nor *Ajaxo* supports defendant's contention.

As to the record, defendant relies principally on a trial exhibit: a proposed letter agreement defendant sent to homeowners (apparently in January 2009), before plaintiff filed suit. Under the proposed letter agreement, the homeowner would agree to pay the "minimum 4% Assignment Fee amount" "until we resolve our dispute, or until . . . April 1, 2009 . . . whichever occurs first" – in return for which defendant would "not take legal action to enforce [its] claim to collect additional Assignment Fees" until April 1, 2009. We fail to see how an offer to bill temporarily at 4 percent establishes that "a 4% outcome" was defendant's objective all along – particularly in the face of its concurrent 10 percent billing (and, much later, its appeal of the trial court's ruling that 4 percent was the proper formulation).[3]

Defendant insists there is a "wealth of evidence beyond" the proposed letter agreement, to the effect that defendant was always ready to abandon its 10 percent demand if only plaintiff would stop the litigation. This "wealth of evidence" consists of a confidential settlement offer defendant made on February 24, 2011, before the trial in March 2011, that included a 4 percent fee structure (with cost of living adjustments instead of the 2021 reappraisal), and also three offers plaintiff made in February, March and July 2011 (the last one, proposed after the trial and

---

[3] Defendant also repeatedly points out that plaintiff did not raise the 10 percent/4 percent breach of contract issue in its original complaint. This is utterly without significance, as plaintiff's operative complaint was filed four months later, with no responsive pleading from defendant in the interim.

before the statement of decision in November 2011, using a
1.5 percent formulation).[4]

We reject the notion that any of the settlement
communications constitute "pleadings, trial briefs, opening
statements, and similar sources" that *Hsu* tells us the trial court
is to use to compare the relief awarded on the contract with "the
parties' demands on those same claims and their litigation
objectives[.]"  (See *Hsu, supra,* 9 Cal.4th at p. 876.)  Settlement
communications are not sources "similar" to "pleadings, trial
briefs, [and] opening statements."  (*Ibid.*)  They were not
presented at trial, and we decline to allow their use to establish
that defendant's "litigation objectives" were in fact different from
the "demands" it made on those claims throughout the litigation.

Putting aside the parties' arguments over whether the use
of these settlement communications is permissible under
Evidence Code section 1152,[5] settlement communications are not

---

[4]     In chronological order, the settlement communications
defendant relies on to support its "many offers to accept a 4%-
based fee" consist of a February 14, 2011 "confidential . . .
inadmissible settlement offer" from plaintiff, to which defendant's
February 24, 2011 offer was a counter; plaintiff's March 16, 2011
"confidential and inadmissible settlement communication"
countering defendant's February 24, 2011 offer; and plaintiff's
July 5, 2011 counteroffer (stating, among other points, that the
counteroffer "also reflects the unlikelihood of your prevailing on
any figure above 4%, and the strong likelihood that [plaintiff] will
be awarded its attorneys' fees under the lease in litigating
against a calculation proved incorrect").

[5]     Evidence Code section 1152 states:  "Evidence that a person
has, in compromise . . . , furnished or offered or promised to
furnish money or any other thing, act, or service to another who

16

comparable to the sources identified in *Hsu*, which are unequivocal statements of a party's litigation objectives. The objectives in settlement negotiations are utterly unlike litigation objectives stated in court proceedings to obtain a legal decision. Neither of the authorities defendant cites – *Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103 (*Scott*) and *Meister v. Regents of the University of California* (1998) 67 Cal.App.4th 437 (*Meister*) – suggests otherwise.

      *Scott* construed Code of Civil Procedure section 998 and is irrelevant to the issue here. (*Scott, supra,* 20 Cal.4th at p. 1114 [a losing defendant whose settlement offer exceeds the judgment is treated for purposes of postoffer costs (including attorney fees under section 1717) as if it were the prevailing party].) *Meister* likewise had nothing to do with a prevailing party determination (and involved a statutory attorney fee provision, not section 1717). The "only question on appeal [was] whether the trial court's method of calculating the amount of the attorney's fee award was appropriate."[6] (*Meister, supra,* 67 Cal.App.4th at p.

---

has sustained or will sustain or claims that he or she has sustained or will sustain loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his or her liability for the loss or damage or any part of it." (*Id.*, subd. (a).)

[6]     *Meister* held the trial court did not abuse its discretion when it found that attorney hours expended after an oral settlement offer "were not 'reasonably spent' on the litigation because plaintiff could have obtained all of the relief he ultimately achieved, and more, by accepting that offer." (*Meister, supra,* 67 Cal.App.4th at pp. 449-450; but see *Greene v. Dillingham Construction N.A., Inc.* (2002) 101 Cal.App.4th 418, 426 ["declin[ing] to follow [*Meister*'s] holding that a trial court can

17

446.) Neither case has anything to do with a prevailing party determination under section 1717.

Defendant's reliance on *Ajaxo* (for the proposition that if the *Ajaxo* plaintiff was a prevailing party, so is defendant) is equally misplaced. *Ajaxo* rejected a defendant's contention that the plaintiff did not achieve sufficient success to qualify as the prevailing party on a breach of contract cause of action. (The jury found a breach and awarded the plaintiff $1.29 million in damages, "far short of the damages [the plaintiff] initially sought[.]" (*Ajaxo, supra,* 135 Cal.App.4th at p. 59.)) *Ajaxo* does not help defendant in the slightest, because the plaintiff there "won a simple, unqualified verdict on the breach of contract claim and established monetary damages in excess of $1 million. Ergo, it was the 'party prevailing on the contract'" under *Hsu*. (*Ajaxo,* at p. 59.) As we have said before, and as defendant stubbornly refuses to acknowledge, defendant did not obtain "a simple, unqualified decision in [its] favor . . . on the . . . contract claim in the action." (*Hsu, supra,* 9 Cal.4th at pp. 865-866.)[7]

---

consider an informal settlement offer in making [a] determination" on whether fees were reasonably spent].)

[7] Defendant also cites *Pacific Custom Pools, Inc. v. Turner Construction Co.* (2000) 79 Cal.App.4th 1254 (*PCP*) for the proposition that "[w]here a litigant has achieved all its dominant litigation objectives (but not a complete victory on every single issue), some appellate courts would declare the litigant a prevailing party as a matter of law[.]" (Defendant mis-cites *Hsu* for the same proposition.) The *PCP* case had nothing to do with "dominant litigation objectives." The court held the trial court's refusal to award attorney fees to the cross-defendant was an abuse of discretion. (*PCP,* at p. 1273; see *id.* at p. 1272 ["By succeeding in having summary judgment granted on the cross-

18

As we indicated earlier, there is no doubt that plaintiff sought to eliminate the fee in its entirety. But plaintiff's failure in that objective does not cancel out its success in reducing the assignment fees by an enormous amount. Defendant's focus on "dominant litigation objectives" is not the rule stated in *Hsu* or anywhere else.[8]

In short, a party's failure to obtain its preferred litigation objective (here, complete elimination of the fee) does not mean that the other party is *ipso facto* the prevailing party. The rule we follow is the rule as stated in *Hsu*, and as reiterated in *Scott, supra,* 20 Cal.4th at page 1109: "If neither party achieves a complete victory on all the contract claims, it is within the discretion of the trial court to determine which party prevailed on the contract or whether, on balance, neither party prevailed sufficiently to justify an award of attorney fees."

---

complaint, there can be no doubt that [the cross-defendant] obtained a 'simple, unqualified win.' "].) Further, the trial court's refusal to award fees was based on its misinterpretation of the attorney fee provision in the contract. (*Id.* at pp. 1269-1270.) *PCP* has no application here.

[8] Defendant also tells us that *Sears v. Baccaglio* (1998) 60 Cal.App.4th 1136 "teaches that [defendant] prevailed." In that case, the court found no abuse of discretion in the trial court's determination that the defendant, who established that the plaintiff's guaranty was enforceable, was the prevailing party, even though the defendant had to repay more than half the money the plaintiff had paid him (under protest) under the " 'hotly disputed' " guaranty. (*Id.* at pp. 1158-1159.) We fail to see how *Sears* is "instructive" on the facts in this case.

We pause to note a related point. Defendant repeatedly points out that it brought no affirmative claims and that the 10 percent/4 percent question was "only a defensive issue." And plaintiff repeatedly contends that defendant "did not 'recover' anything" because defendant did not assert any claims, and the amounts the amended judgment declares are presently owing (or payable in the future) relate to plaintiff's claims for declaratory relief on the calculation issue. Neither party's position has any material effect on the conclusion we reach. *Hsu* directs us to "respect substance rather than form" in determining litigation success. (*Hsu, supra,* 9 Cal.4th at p. 877.)

The substance is that defendant has a judgment declaring amounts owing in the millions of dollars that is "enforceable as a money judgment." But the substance is also that the amounts declared owing are $58 million less than the amounts defendant sought until this court's decision in December 2014 in *Marina Pacifica I.* (See 232 Cal.App.4th at pp. 504-505 ["[Defendant] raises two main issues on appeal," the second of which was its contention "the 10 percent formulation, not the 4 percent formulation, represents the correct method for calculating the assignment fee"].)

And so we return to the question whether the trial court abused its discretion in finding no prevailing party.[9] Defendant

---

[9] We also reject defendant's contention we should give no deference to the trial court's prevailing party determination because the court (Judge Vicencia, who also issued the December 28, 2015 amended judgment) did not preside over the trial in 2011 and therefore was not "in the best position to identify dominant litigation objectives" and "had no familiarity with the underlying proceedings." There is no merit at all to this contention, and the case defendant cites does not support it. (See

insists it did, because "where, as here, the results are lopsided, it still is an abuse of discretion to deny prevailing party fees." Defendant cites *de la Cuesta v. Benham* (2011) 193 Cal.App.4th 1287 (*de la Cuesta*), where the court explains that: "If the results in a case are lopsided in terms of one party obtaining 'greater relief' than the other in comparative terms, it may be an abuse of discretion for the trial court *not* to recognize that the party obtaining the 'greater' relief was indeed the prevailing party." (*Id.* at p. 1295; see also *Silver Creek, LLC v. BlackRock Realty Advisors, Inc.* (2009) 173 Cal.App.4th 1533, 1541 ["Although a trial court has broad discretion to determine the prevailing party in a mixed result case, its discretion is not unlimited."].)

The *de la Cuesta* principle is sound, but it does not apply here. The question, as *de la Cuesta* observed, is "[h]ow lopsided must the results be before it is an abuse of discretion not to acknowledge that one party has clearly prevailed?" (*de la Cuesta, supra,* 193 Cal.App.4th at pp. 1295-1296.) The court pointed out that the reason for the discretion clause "was obviously to allow trial courts to take into account the unique facts and circumstances of each case, as reflected in the 'totality' and substance language from *Hsu*."[10] (*Id.* at p. 1296.)

---

*Mann v. Quality Old Time Service, Inc.* (2006) 139 Cal.App.4th 328, 346 [issue was the amount of fees to award a defendant who partially prevailed on an anti-SLAPP motion].)

[10] *De la Cuesta* was an unlawful detainer action where the landlord sought unpaid rent of $103,000 and the tenant "asserted the extreme position that she owed *nothing* by way of back rent" because of leaks in the premises. (*de la Cuesta, supra,* 193 Cal.App.4th at p. 1296.) The tenant vacated the premises the day before trial, and the landlord recovered 70 percent of the

21

We see nothing "lopsided" in the results in this case. *Hsu'*s directive is to compare relief awarded to the parties with their litigation demands and objectives. Here, plaintiff sought to pay nothing, but instead the judgment required it to pay $39 million over time instead of the $97 million defendant sought to charge. That is relief of $58 million, while defendant established its right to recover $39 million rather than nothing. The fact that defendant obtains an actual monetary payment, while plaintiff obtains only a reduction in its monetary obligations as claimed by defendant, does not render that reduction meaningless. *Hsu* instructs courts to respect substance over form, and *de la Cuesta* correctly observes that courts may consider "the unique facts and circumstances of each case" (*de la Cuesta, supra,* 193 Cal.App.4th at p. 1296). That is what the trial court did here when it determined there was no prevailing party, and we see no error.

## 2.     Plaintiff's Cross-appeal of the Attorney Fee Order

In its cross-appeal, plaintiff does not try to persuade us to find the trial court abused its discretion. Instead, plaintiff contends that if we are persuaded by defendant that the trial court abused its discretion by finding no party prevailed, then we

---

amount he claimed. The trial court found there was no prevailing party, and the Court of Appeal reversed because the result was "*so* lopsided that, even under an abuse of discretion standard, it was unreasonable to say the landlord was not the prevailing party." (*Id.* at pp. 1290, 1296; *id.* at pp. 1296, 1299 ["[t]he landlord . . . got about 70 percent of the *most* of what he sought going into trial; the tenant got zero percent," ending up "with a judgment of about $70,000 against her"; the landlord obtained "the 'greater' part of its two litigation objectives: repossession and compensation"].)

should find plaintiff was the prevailing party. Because we have concluded the trial court did not err, we need not discuss plaintiff's cross-appeal further.

**3.     The Appeals From the Order Denying Costs**

    **a.     The legal principles**

Section 1032 governs the recovery of costs by the prevailing party. Under section 1032, " 'Prevailing party' includes the party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant. If any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not . . . ." (*Id.,* subd. (a)(4).) Section 1032 further provides that, "[e]xcept as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (*Id.*, subd. (b).)

As the Supreme Court has observed, " ' "The theory upon which [costs] are allowed to a plaintiff is that the default of the defendant made it necessary to sue him; and to a defendant, that the plaintiff sued him without cause. Thus the party to blame pays costs to the party without fault." ' " (*DeSaulles v. Community Hospital* (2016) 62 Cal.4th 1140, 1147 (*DeSaulles*).) "Section 1032 codifies this approach to allocating costs." (*Ibid.*) *DeSaulles* also tells us that the definition of "prevailing party" in section 1032 "is particular to that statute and does not necessarily apply to attorney fee statutes or other statutes that use the prevailing party concept." (*DeSaulles,* at p. 1147.)

23

### b. Contentions and conclusions

As previously noted, after finding no prevailing party for attorney fee purposes, the trial court "[l]ikewise" found no prevailing party "with respect to the entitlement of costs." Defendant argues, to the contrary, that the judgment "indisputably" gave defendant a "net monetary recovery" and therefore entitled defendant to costs as a matter of right. Plaintiff, in its cross-appeal, makes the very same claim: that it is entitled to costs because it had a "net monetary recovery."

Defendant's theory is that the judgment entitles it to collect $12 million in arrearages and "easily $27 million more through 2041," while plaintiff recovered only $14,000 on its breach of contract claim. (This is because most of the homeowners withheld payment of the assignment fees during the litigation.) Plaintiff's theory is that it was the only party seeking monetary relief, and it recovered $14,000, whereas defendant "had no claims so it recovered nothing"; instead, "the amounts stated in the judgment reflect declaratory relief *awarded to* [*plaintiff*], reducing the amounts [defendant] was trying to collect by 60%."

Neither of these theories is correct. It seems to us that this is a textbook case for the trial court's exercise of discretion to "allow costs or not," because the statute expressly allows a court to do so "[i]f any party recovers other than monetary relief and in situations other than as specified[.]" (§ 1032, subd. (a)(4).)

If (as plaintiff contends) "net monetary recovery" refers solely to monetary damages affirmatively sought by a party, then only plaintiff obtained any "monetary relief": $14,000 in damages for defendant's collection, in breach of the unit lease, at the 10 percent rate. Defendant brought no cross-complaint and sought no damages for breach of contract or anything else, merely

24

defending against plaintiff's claims.  But even under this theory, the judgment nevertheless *also* provides both parties with declaratory relief – that the fee was valid, but that it was collectible only at the 4 percent rate.

Viewed this way, while only the plaintiff recovered damages ($14,000), both parties "recover[ed] other than monetary relief[.]"  (§ 1032, subd. (a)(4).)  And in such a circumstance, section 1032 expressly gives the trial court the authority to determine the prevailing party and to "allow costs or not":  "*If any party recovers other than monetary relief and* in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not . . . ."  (*Ibid.*, italics added.)

On the other hand, if (as defendant claims) "net monetary recovery" is viewed in terms of the sums of money actually changing hands under the amended judgment, then defendant has a "net monetary recovery."  The amended judgment expressly states that, to the extent the judgment "declares amounts presently owing, it is enforceable as a money judgment," and to the extent the judgment declares defendant's rights to receive future payments, "any such payments shall be deemed ordered by and payable pursuant to this Final Judgment."

But even under this analysis, in addition to the "net monetary recovery" obtained by defendant, plaintiff has "recover[ed] other than monetary relief," because plaintiff obtained declaratory relief to the effect that defendant could not collect the fee at the 10 percent rate.  This ruling, while not a "monetary recovery," reduced plaintiff's potential liability by $58 million.  The "net monetary recovery" provision does not

25

eliminate the trial court's discretion when one of the parties also "recovers other than monetary relief," and that is the case here.[11]

In sum, plaintiff, in addition to recovering the $14,000 in monetary relief (and being ordered to pay, over time, $40 million), obtained a declaration that the 4 percent formulation applied instead of the 10 percent formulation, and this principle resulted in a reduction in amounts to be paid of $58 million. The case did not simply involve a monetary award; it also involved declaratory relief in plaintiff's favor. Under those circumstances, "the court, in its discretion, may allow costs or not[.]" (§ 1032, subd. (a)(4).)

## DISPOSITION

The order is affirmed. The parties shall bear their own costs.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.          RUBIN, J.

---

[11] We do not find guidance in either of the cases cited by the parties. Defendant relies on *DeSaulles, supra,* 62 Cal.4th 1140, and both parties rely on *Michell v. Olick* (1996) 49 Cal.App.4th 1194, but neither case addresses circumstances comparable to those here. Neither involved a judgment that provided declaratory relief affecting future liabilities, as well as monetary recoveries. Both *DeSaulles* and *Michell* involved monetary recovery and nothing more.